IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 11-cv-01557-PAB-KLM

ENTEK GRB, LLC,

      Plaintiff,

v.

STULL RANCHES, LLC,

      Defendant.

---

## ORDER

---

      This matter is before the Court on the Motion for Preliminary Injunction [Docket No. 126] filed by plaintiff Entek GRB, LLC.  On August 1, 2012, the Court heard testimony presented by plaintiff and defendant Stull Ranches LLC ("Stull").  The Court exercises jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

## I.  FINDINGS OF FACT

      1.  Entek is the lessee of mineral estates granted by the Bureau of Land Management ("BLM").  Entek is the successor-in-interest of Stone & Wolf, LLC ("Stone & Wolf") and Clayton Williams Energy, Inc. ("Clayton Williams").  Its mineral estates are located in the Focus Ranch Unit ("FRU"), which is a collection of mineral leases combined to facilitate development.  *See* Pl. Ex. 10.  The FRU was created in 1999 and consists of 40,000 acres located in Routt County, Colorado.  Entek is the operator of the FRU.

2.  The majority of the land located in the FRU is leased pursuant to federal statutes.  The two relevant statutes for purposes of this motion are the Stock-Raising Homestead Act of 1916 ("SRHA"), 43 U.S.C. § 291 *et seq.* (repealed in part by Pub. L. 94-579 (1976)), and the Mineral Leasing Act of 1920 ("MLA"), 30 U.S.C. § 181 *et seq.*  The SRHA severed the surface and mineral estates for public lands in the western states to facilitate the concurrent development of both the surface and subsurface resources.  *Watt v. W. Nuclear, Inc.*, 462 U.S. 36, 42-45 (1983).  In passing the statute, Congress expected homesteaders to use the surface for raising stock and crops, while Congress sought to ensure that valuable subsurface resources would remain at the disposition of the United States.  *Id.*  Although the SRHA was repealed in part in 1976, the section of the statute that reserves mineral estates for the federal government is still in effect.  43 U.S.C. § 299.  The MLA was enacted to give the Secretary of the Interior broad power to issue oil and gas leases on public lands even if they were not located in known producing oil and gas fields.  *Udall v. Tallman*, 380 U.S. 1, 2 (1965).

3.  Entek's mineral leases and patents in the FRU are granted pursuant to these federal statutes.  It owns the rights to Patent 985094, Pl. Ex. 3, Patent 1010281, Pl. Ex. 4, Lease COC-59666, Pl. Ex. 5, Lease COC-69894, Pl. Ex. 6, and Lease COC-59491. Pl. Ex. 7.  These leases and patents are for minerals located subjacent to Stull's surface estate.  Stull does not challenge Entek's ownership rights to these minerals.

4.  Entek is the lessee of minerals from well 3-1.  The 3-1 well is located on land owned by the BLM.  Entek seeks to enter the 3-1 well to complete well bore work and to start production activity.  The 3-1 well is located in the northwest quarter of Section 3,

Township 11 North, Range 88 West of the FRU.  *See* Pl. Ex. 2.  Currently, there is only one available road ("Access Road") from which Entek may reach the 3-1 well.  The Access Road runs from the southeast of the FRU in Section 11, Township 11 North, Range 88 West to the northwest at Section 33, Township 12 North, Range 88 West.

5.  Entek cannot reach the 3-1 well from the southeast because of the ruling in *Stone & Wolf, LLC v. Three Forks Ranch Corp.*, No. 00-cv-01130-REB-OES, 2004 WL 5615898 (D. Colo. Jan. 8, 2004).  In addition, because Stull owns the surface and mineral estates for property located in Section 3, Township 11 North, Range 88 West over which the Access Road crosses, Stull has refused to give permission to Entek to use the southeast portion of the road for the purpose of accessing the 3-1 well.  *See* Pl. Ex. 2.

6.  Lessees Clayton Williams and New Frontier Energy, Inc. ("New Frontier") accessed the 3-1 well by using an easement ("Stull Easement") obtained through an agreement with Stull.  The Stull Easement utilized the northwest portion of the Access Road, which travels across Section 33, Township 12 North, Range 88 West into Section 3, Township 11 North, Range 88 West.  *See* Pl. Ex. 2.  However, Stull revoked the easement after New Frontier violated its terms.  Stull refuses to grant Entek an easement, arguing that allowing oil companies to use the Access Road adversely affects its land.  Stull claims that its ranch is known as a pristine and peaceful destination filled with wildlife on which it runs a small hunting business.  Stull claims that the use of the Access Road by oil companies has a negative effect on its hunting business and poses a danger for elk, cattle, and sage grouse.

7.  In September 2011, Entek filed a motion for a preliminary injunction to gain access to the 3-1 well.  The Court denied Entek's September 2011 motion for an injunction because the injunction was outside the scope of the complaint.  After the denial of the preliminary injunction, Entek sought an alternate route to reach the 3-1 well.  It made a proposal to the BLM to create another road on BLM property to enter the 3-1 well, *see* Pl. Ex. 33, which the BLM denied on November 8, 2011.  *See* Pl. Ex. 34 at 1-4.  Entek appealed the decision on December 5, 2011 and is currently awaiting a response.

8.  Because of federal and state regulations, Entek has approximately three months to perform surface altering activities in the FRU.  The season during which Entek can work on the 3-1 well usually begins in July and ends forty-eight hours before the start of rifle season for big game in the fall.  This year, the drilling season began on July 1, 2012 and will conclude sometime in October.

9.  Entek filed the present motion for a preliminary injunction after it became clear that the BLM would not approve an alternate road before October 2012.  Entek seeks access to the 3-1 well before October to perform well bore activity and prepare the well for drilling.  Entek seeks to enjoin Stull from restricting its ability to reach the 3-1 well.

10.  Entek states that it will utilize directional drilling to reach approximately 8000 feet below the well's surface.  Entek claims that drilling at this depth will reach minerals located subjacent to Stull's surface under Lease COC-59491 and Patent 985094.  *See* Pl. Ex. 12 at 3.  According to Entek, the bottom of the well hole will be subjacent to

surface separately owned by the Sheep Mountain Partnership ("Sheep Mountain") and Stull. *See id.*

11.  Entek claims that, if it is not able to access the 3-1 well during this drilling season, it will be subject to irreparable harm.  Tim Hopkins, Entek's regional manager, testified at the hearing.  He estimates that a one year delay in the production of the 3-1 well could cost Entek between $1.2 and $1.8 million in lost revenue.  This sum is based on the 3-1 well producing 200 barrels of oil per day with an oil price of $75 per barrel. Mr. Hopkins based these estimates on the rate of production of the 12-1 well.  The 12-1 well is located in the FRU, and Mr. Hopkins believes that the 12-1 well is a good predictor of the 3-1 well's potential because both wells were built in the same year and have similar characteristics.  He testified that a one year delay in production will also delay the production of other wells in the FRU and delay further knowledge of the geological structure of the oil fields.

12.  Mr. Hopkins estimated that it would cost Entek $4 million (non-amortized) to complete construction of the well.  Mr. Hopkins testified that such work will involve 25 semi-trucks hauling water, pipes, and cement over the Access Road for 30 to 60 days. He testified that the increase of activity on the Access Road could require additional road construction and could affect Stull's hunting business.  Mr. Hopkins said that it was common for oil companies to work on properties reserved for hunting.

13.  Mr. Hopkins testified that Entek has secured permits from the BLM and the Colorado Oil and Gas Conservation Commission ("COGCC") to commence drilling activity.  Entek also secured a drilling crew and is prepared to commence drilling activity at any time.  It applied for three bonds pursuant to the SRHA.  *See* Pl. Ex. 15.  The

5

BLM only granted the bond for Lease COC-59491.  *See* Pl. Ex. 16.  Stull claims that the

BLM did not grant bonds for Leases COC-59666 and COC-69894 because the BLM

does not grant bonds for leases on which no drilling activity is conducted.

14.    David Smith, Entek's land manager, testified at the hearing.  Mr. Smith's

duties include reviewing Entek's land records and patents.  Mr. Smith has reviewed

Leases COC-59666, COC-69894, and COC-59491.  In reviewing these leases, he did

not find clauses which purported to grant a mineral lessee the right to use the surface

area owned by one individual to access a mineral estate on the surface of another.

## II.  ANALYSIS

A party seeking a preliminary injunction must show (1) a likelihood of success on

the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of

preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that

the injunction is in the public interest.  *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208

(10th Cir. 2009) (citing *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7,

20 (2008)).  The Tenth Circuit has made it clear that "because a preliminary injunction

is an extraordinary remedy, the right to relief must be clear and unequivocal."

*Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir.

2009).

For certain preliminary injunctions, the movant has a heightened burden of

showing that the traditional four factors weigh heavily and compellingly in its favor

before obtaining a preliminary injunction.  *See Kikumura v. Hurley*, 242 F.3d 950, 955

(10th Cir. 2001).  The heightened burden applies to preliminary injunctions that (1)

disturb the status quo, (2) are mandatory rather than prohibitory, or (3) provide the movant substantially all the relief it could feasibly attain after a full trial on the merits. *Id*. The Tenth Circuit has described the status quo as the "last uncontested status between the parties which preceded the controversy until the outcome of the final hearing." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1260 (10th Cir. 2005) (citing *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir. 2001)). "In determining the status quo for preliminary injunctions, th[e] court looks to the reality of the existing status and relationship between the parties and not solely to the parties' legal rights." *Schrier*, 427 F.3d at 1260.

The last uncontested status between the parties was before Entek filed its verified complaint on June 8, 2011. Docket No. 18. Before that date, in order to access the 3-1 well, Entek and its predecessors-in-interest did not claim a legal right to use the Access Road, but rather negotiated to secure an easement. Although Entek asserts that there has never been a "peaceable uncontested status" between the parties, the Court disagrees. Docket No. 138 at 11. In acquiring New Frontier's rights to the FRU, Entek had notice that its access to the 3-1 well was contingent on the use of the Access Road. By seeking a judicial determination that it is entitled to the use of the Access Road without an easement, Entek's complaint alters "the reality of the existing status and relationship" between itself and Stull. *Schrier*, 427 F.3d at 1260. Consequently, Entek seeks to alter the status quo and must make a heightened showing of the four preliminary injunction factors. *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 342 F.3d 1170, 1177 (10th Cir. 2003).

## A.   Likelihood of Success on the Merits

The issue presented by Entek's motion for preliminary injunction is whether Entek may use Stull's surface for the development and production of a well located on the BLM's surface.  Entek makes three arguments in support of its right to do so.  First, it argues that, pursuant to 43 U.S.C. § 299, it has the right to cross any surface area to reach resources subject to its mineral leases.  Docket No. 126 at 10.  Second, Entek claims that, because of the FRU, it can use the Access Road to reach the 3-1 well through the theory of unitization.  *Id*. at 12.  Third, Entek contends that it can use the Access Road to reach the 3-1 well based on the "unity rule."  *Id*. at 11.

### 1.   Relationship between Mineral and Surface Estates

In general, a surface estate is subservient to a mineral estate.  Because the mineral estate is considered the dominant estate, it impliedly carries with it a right to use as much of the surface as may be reasonably necessary for operations relating to the mineral estate.  *Gerrity Oil & Gas Corp. v. Magness*, 946 P.2d 913, 926 (Colo. 1997).  As the Colorado Supreme Court noted in *Gerrity Oil*, the owner of a mineral estate has an implied limited right to use the surface in order to reach and extract minerals because severed mineral rights lack value unless the subsurface minerals can be developed.  *Id*. at 927.  Cases analyzing the relationship between federal mineral and surface estates have reached the same conclusion.  In *Kinney-Coastal Oil Co. v. Kieffer*, 277 U.S. 488 (1928), the Supreme Court discussed the effect of the federal government's reservation of mineral rights under the Agricultural Entry Act of 1914 ("AEA"), 30 U.S.C. § 121 *et seq*., and the MLA.  *Id*. at 504.  The Supreme Court found

that the AEA and MLA created servitudes "on the surface estate for the benefit of the mineral estate to the end, as the acts otherwise show, that the United States may realize, through the separate leasing, a proper return from the extraction and removal of the minerals." *Id*. A mineral lessee's right to reasonably use the surface estate to develop its minerals is generally well settled under both Colorado and federal law.

Similarly well settled is the rule that the holder of the minerals underlying a tract of land will not be permitted to use the surface area of that tract in aid of mining operations on adjacent or adjoining tracts of land. *See, e.g., Mountain Fuel Supply Co. v. Smith*, 471 F.2d 594, 596 (10th Cir. 1973) (interpreting federal law and finding that "a surface owner of [federal land] . . . may object to surface use of his lands by an oil and gas lessee for operations conducted upon other lands under a different ownership."); *Percy La Salle Mining & Power Co. v. Newman Mining, Milling & Leasing Co.*, 300 F. 141, 143 (D. Colo. 1924) (applying general common law principles from England and the United States and finding that a mining lease conveys the right to search for and extract minerals from the lease property, which does not include the right to take minerals from adjoining property); *Bourdieu v. Seaboard Oil Corp. of Del.*, 100 P.2d 528, 534 (Cal. App. 1940) (interpreting federal law and finding that the SRHA and MLA do not allow for the development of land adjacent to the mineral estate); *Wiser Oil Co. v. Conley*, 346 S.W.2d 718, 722 (Ky. 1961) (applying Kentucky law and finding that "[i]t is well settled in Kentucky, as elsewhere, that in the absence of an express agreement, the mineral owners or lessees cannot use the surface for the production of minerals from other lands"); 83 A.L.R.2d 665 § 3(a) (collecting cases).

The leading authority on this issue is the Tenth Circuit's decision in *Mountain Fuel*. The Tenth Circuit addressed the question of what rights, if any, a federal mineral lessee possesses to use a surface estate for "development and production" on adjoining or adjacent land of others. *Id*. at 596. The dispute in *Mountain Fuel* involved eleven different surface leases obtained pursuant to the AEA. 471 F.2d at 595. The surfaces of the leases were contiguous and the surface leases were commonly owned by defendants. The mineral estates on these lands were unitized pursuant to Utah law. *Id*. at 595-96. The oil and gas lessees claimed that they could use defendants' land to develop and produce minerals anywhere in the unitized zone, including the development of minerals on property adjoining or adjacent to defendants' surface area. *Id*. at 596. The Tenth Circuit disagreed, finding that a surface owner of a tract of land where the minerals were reserved to the government could "object to surface use of his lands by an oil and gas lessee for operations conducted upon other lands under a different ownership." *Id*. at 596. In so holding, the Tenth Circuit made four separate findings. First, it found that mineral lessees are restricted in their use of the surface by the geographic extent of their particular lease or leases. *Id*. Second, when formerly separate surface estates are combined under a single ownership (in this case contiguous surfaces), the purpose of treating the surface estates as separate no longer exists.[1] *Id*. Third, unitization "is of no significance other than to the extent that the particular leases covering the minerals under the defendants' surface may have been actually and legally modified." *Id*. at 597. Fourth, when mineral leases are unitized, it is

---

[1] As will be discussed below, this concept has been referred to as the "unity rule."

not the location of the materials which is important for a mineral estate to acquire

surface access, but rather the location of the well.  *Id*.  ("the trial court was thus correct

insofar as it held that plaintiffs could not use defendants' surface for development *on*

the lands of others or to haul over such surface the production *from the lands of*

*others*.") (emphasis added).

In *Three Forks Ranch*, a court in this District dealt with a claim similar to Entek's

claim here by Entek's predecessors-in-interest.[2]  2004 WL 5615898.  Three Forks

Ranch ("TFR") owned the surface rights to land located in the FRU.  *Id*. at *3-4.  Stone

& Wolf and Clayton Williams (collectively plaintiffs) sought to use the Access Road from

the southeast to reach a proposed well.  *See* Pl. Ex. 2.  When TFR objected to

plaintiffs' use of the Access Road, plaintiffs sought a judgment declaring their right to

use the Access Road over surface owned by TFR.  *Three Forks Ranch*, 2004 WL

5615898, at *4.  TFR was not a party to the FRU and the proposed well was not located

on TFR's property.  *Id*.  The court in *Three Forks Ranch* interpreted *Mountain Fuel* to

establish two legal principles, what it termed the "two surface owners rule" and the

"unitary tract rule."  *Id*. at *10.  The court interpreted the two surface owners rule to

mean that a "mineral lessee may not use, e.g., cross, the surface of a tract owned (or

leased or otherwise controlled) by one party to develop minerals subjacent to a surface

owned by a second party."  *Id*.  The court interpreted the unitary tract rule to stand for

---

[2]The earlier case by Stone & Wolf and Clayton Williams involved the identical Access Road, the identical right of access claim, and the identical FRU agreement. *See Three Forks Ranch*, 2004 WL 5615898.  Although *Three Forks Ranch* raises questions of collateral estoppel, the Court need not address that issue for the purposes of this motion.

the proposition that, if the various surface titles are held in common, then "one surface estate" should be considered in analyzing the surface's use by a "mineral lessee who controls the subjacent, dominant mineral estate." *Id*. The court, however, noted that a mineral lessee is restricted in the use of the surface by the geographic extent of his particular lease. *Id*.

In applying these principles, the court in *Three Forks Ranch* held that plaintiffs could not use the Access Road to reach drill sites not located on TFR's surface. *Id*. at 12. The court rejected the notion that anything in the FRU, Colorado statutes, or federal regulations expanded the burden on TFR's surface simply because plaintiffs' mineral estates were included in the FRU. *Id*. The court also found that nothing in the deeds, leases, or patents increased the burden on TFR's surface estate to accommodate plaintiffs' mineral estates in the FRU. *Id*. Third, it found that the SRHA envisioned a contractual relationship between the mineral and surface estates and did not expand the rights of the mineral estate. *Id*. at 13. Fourth, it found that nothing in the FRU expressly or implicitly required TFR to accommodate plaintiffs' mineral estates. *Id*. The court made two further findings of relevance to the facts at issue here:

> 8. That where the plaintiffs own the mineral estates and the defendant owns the surface estates in common in two or more contiguous tracts, then the plaintiffs have the right to use so much of the surface estate of any such tract owned, leased, or controlled by the defendant as is necessary to achieve reasonable access to the plaintiffs' mineral estate located subjacent to any such tracts;
>
> 10. That where dominant mineral estates which are leased by the plaintiffs and which are subjacent to the unitary, servient, surface estate owned by the defendant, then throughout Three Forks Ranch where this relationship exists between the defendant's surface and the plaintiffs' minerals, the plaintiffs have the right to use so much of the defendant's surface estate

> which is reasonably necessary to reach, develop, and remove the
> plaintiffs' subjacent minerals, regardless of whether those mineral estates
> are located within the defendant's unitary tract, i.e., ranch.

*Id*. at *15-16.

Entek cites *Kysar v. Amoco Prod. Co.*, 93 P.3d 1272 (N.M. 2004), as altering the

two surface owners rule of *Mountain Fuel*.  In *Kysar*, the Kysar family owned a ranch in

San Juan County, New Mexico.  *Id*. at 1273.  The former owner of the ranch, Maude

Keys, signed an oil and gas lease (the "Keys lease") with the predecessor-in-interest to

the current lessee, Amoco Production Company, in exchange for royalties.  *Id*.  The

Keys lease did not contain a provision allowing the mineral lessee the use of the

surface to reach other tracts located outside the land covered by the lease.  *Id*.  The

Keys lease was amended in 1953 to include the following terms:

> [A]t its option and without lessor's joinder or further consent to pool and
> unitize the leasehold estate and the lessor's royalty estate . . . with the
> rights of any third parties . . . so as to create . . . one or more drilling or
> production units . . . each such drilling or production unit shall not exceed
> 320 acres . . . The commencement, drilling, completion of or production
> from a well, or any portion of a unit created hereunder, shall not have the
> effect of continuing this lease in force insofar as it covers the land not
> included within such unit, and no unit shall be created which covers and
> includes land in more than one Section.

*Id*.  Amoco entered into a Communitization Agreement in 1992 pursuant to the MLA.

*Id*.  The Kysars did not sign or otherwise consent to the agreement.  *Id*. at 1275.

Soon after the Communitization Agreement, Amoco began using portions of the

Kysars' ranch not subject to the Communitization Agreement to reach the so-called

Sullivan well.  *Id*.  The Sullivan well was not located on the Kysars' ranch, but sat on

property included in the Communitization Agreement.  The Kysars objected to this use

of their ranch and filed a lawsuit alleging that Amoco's use of the Keys lease was
unlawful trespass.  The Kysars argued that Amoco could not use their property to
develop the Sullivan well because of the general rule that a lessee "will not be permitted
to use the surface thereof in aid of mining operations on adjacent, adjoining, or other
tracts of land."  *Id*. at 1278.  Amoco argued that the Communitization Agreement gave it
an implied right of access to lands anywhere within the unit and anywhere within the
Keys leasehold because of the common ownership of the ranch.  *Id*. at 1279.

      After reviewing cases from other jurisdictions and the relevant federal statutes,
the New Mexico Supreme Court found that "in determining the extent of the implied
easement Amoco enjoys [it is necessary to examine] what the lease authorized and
what right or rights may be implied from that authority."  *Id*. at 1281.  The court held that
Amoco had an implied right to use any of the surface area of the Keys lease subject to
the Communitization Agreement for production on any area included in the Agreement.
*Id*. at 1282.  The court found that, by agreeing to the 1953 amendment, Ms. Keys gave
Amoco the unilateral right to bind the surface area of the lease to any unit or pooling
agreement.  *Id*.  The court found that, when Amoco entered into the 1992
Communitization Agreement, it simply exercised its unilateral right under the 1953
amendment and the Kysars could not object because they acquired the surface area
subject to the 1953 amendment.  *Id*.  Accordingly, the New Mexico Supreme Court held
that Amoco could use any surface area covered by the Communitization Agreement,
without regard to lease boundaries, in order to reach a well located inside the unit.  *Id*.

The New Mexico Supreme Court also found that, although Amoco could use portions of the land in the Keys lease included in the Communitization Agreement, it had no right to use the land from the Keys lease that was not included in the Communitization Agreement to reach the Sullivan well. *Id*. at 1284. Moreover, the court found that, although membership in a Communitization Agreement "may implicitly modify the lease terms, such modification is predicated on the intent of the parties as evidenced by their original consent or later ratification of the modifying document." *Id*. The New Mexico Supreme Court relied exclusively on the terms of the lease in finding an implied modification of the general relationship between the surface and mineral estate by the Communization Agreement. Thus, *Kysar* does not modify the two surface owners rule of *Mountain Fuel*. Moreover, *Kysar* applied New Mexico law to the interpretation of the Communitization Agreement and to the 1953 lease amendment, whereas *Mountain Fuel* construed patents issued pursuant to the Agricultural Entry Act of 1914 ("AEA"), 30 U.S.C. § 121 *et seq*., and the Mineral Leasing Act of 1920 ("MLA"), 30 U.S.C. § 181 *et seq*.

Entek fails to demonstrate any reason based upon its relationship to Stull as a mineral lessee seeking to develop oil and gas from a well located on the surface of a third party that would suggest the two surface owners rule should not apply. Entek argues, however, that federal regulations, the unitization agreement, and the unity rule of *Mountain Fuel* each make the two surface owners rule inapplicable. The Court therefore addresses these arguments.

## 2. Federal Leases

Entek argues that it has a legal right to use Stull's property to reach the 3-1 well because it owns the rights to Leases COC-59491, COC-69894, and COC-59666, which are leases for minerals beneath Stull's surface. Entek claims that, as the lease owner, it has the right to access so much of the leased lands as is necessary to remove the minerals subjacent to those leases. In support of its argument, Entek cites 43 U.S.C. § 299 and 43 C.F.R. § 3101.1-2.

Pursuant to the SRHA, a mineral lessee can access a surface estate by either (1) securing written consent or waiver from the owner of the surface estate, (2) securing an agreement with the owner of the surface estate to pay for any damage that might occur, or (3) executing a bond with the United States to secure payment of any damages to the surface estate. 43 U.S.C. § 299(a).

The SRHA by its terms does not grant Entek a legal right to use Stull's road to reach the 3-1 well. First, Entek does not have Stull's written consent or permission to access the 3-1 well. Second, Entek has secured a bond only for Lease COC-59491. *See* Pl. Ex. 16. As noted above, the Access Road crosses Stull's property on Leases COC-59666, COC-69894, and COC-59491. *See* Pl. Ex. 2. Thus, without a bond for Leases COC-69894 and COC-59666, pursuant to 43 U.S.C. § 299, Entek cannot utilize the Access Road over Stull's surface to develop the 3-1 well. *See* Pl. Ex. 2. Similarly, 43 C.F.R. § 3101.1-2 does not give Entek a legal right to use the Access Road. Although 43 C.F.R. § 3101.1-2 states that a lessee can use so much of the leased land as is necessary to explore for and remove minerals, this regulation is subject to three reservations: (1) stipulations attached to the lease; (2) restrictions deriving from specific

16

nondiscretionary statutes, and (3) reasonable measures to minimize adverse impacts to other resource values. *Wyo. Outdoor Council v. Bosworth*, 284 F. Supp. 2d 81, 91 (D.D.C. 2003).  Taken together, these reservations demonstrate that, while a federal lessee has a legal right to conduct oil and gas operations, before the lessee can exercise this right he must comply with all federal statutes, including 43 U.S.C. § 299(a)'s bond requirement.

Moreover, the Court finds that nothing in the SRHA expressly or impliedly expands the rights of a mineral lessee to use the surface area for the development of *adjacent* mineral rights.  *See Bourdieu*, 100 P.2d at 534 (finding that the SRHA and MLA do not allow for the development of land adjacent to the mineral estate).  As the court noted in *Three Forks Ranch*, the SRHA "contracts, not expands, the right of the mineral holder to use the surface."  2004 WL 5615898, at *13.

Entek has not shown that, pursuant to the SRHA or 43 C.F.R. § 3101.12, it has a legal right to use the Access Road based on its ownership of Leases COC-59491, COC-69894, and COC-59666.  As such, Entek has not met its heightened burden of showing a likelihood of success on the merits for this argument.

### 3.  Unitization

Entek argues that, 43 C.F.R. § 3101.1-2 and 43 C.F.R. § 3186.1[3] create a federal exploratory unit which modifies the leases included within such unit.  As a result, Entek claims these regulations give it an implied right of access to all lands in the FRU. Docket No. 126 at 11.  Entek also argues that the FRU expressly amends each lease

---

[3]The Court notes that 43 § C.F.R. § 3186.1(18) is simply a model for unit agreements signed pursuant to 30 U.S.C. § 226(m).

so that operations on one tract in the unit are for the benefit of other tracts in the unit. *Id*. at 12.

Unitization refers to the consolidation of mineral or leasehold interests in oil or gas covering a common source of supply.[4]  *Amoco Prod. Co. v. Heimann*, 904 F.2d 1405, 1410-11 (10th Cir. 1990).  The goals of unitization are conserving resources by preventing waste and protecting the landowners' correlative rights.  *Id*. at 1411. Typically, two methods exist whereby separately owned tracts can be combined in a single unit: voluntary unitization by contract or forced unitization by regulatory authority. *Id*.

In this case, Stull is not party to the FRU and therefore has not voluntarily altered the burden on its surface estate.  *See, e.g., Kysar*, 93 P.3d at 1281 (finding that an agreement by lessor consenting to the lessee's unilateral authority to join a "pool" stripped lessor of ability to object to the use of surface by members of the pool, even if production was for wells not located on lessor's surface lands); *cf. Celsius Energy Co. v. Mid Am. Petroleum, Inc.*, 894 F.2d 1238, 1240 (10th Cir. 1990) (whether pooling was authorized is determined by the provisions of the lease as a whole and by the pooling clause).  Moreover, Entek does not argue that Colorado has enacted a compulsory unitization law which governs mining activity for land located in the FRU.  *See, e.g., Nelson v. Texaco, Inc.*, 525 P.2d 1263, 1265 (Okla. App. 1974) (discussing the

---

[4]Pooling and unitization refer to different processes.  Pooling involves the combination of several small tracts of land to meet the spacing requirements for a single well, while unitization refers to field-wide or partial field-wide operation of a producing reservoir.  *Amoco Prod. Co. v. Heimann*, 904 F.2d 1405, 1411, n. 3 (10th Cir. 1990).

Oklahoma Unitization Act which alters the rights of surface and mineral estate owners).

Instead, Entek claims that, because the federal government reserved the rights to the

mineral estates in question, the FRU creates an implied right of ingress or egress for

surface estates overlying all federal mineral estates included in the FRU.  Docket No.

126 at 7-10.

As noted above, unitization can alter the relationship between mineral and

surface estates.  *See Kysar*, 93 P.3d at 1284 (modification is predicated on the intent of

the parties as evidenced by their original consent or later ratification of the modifying

document).  However, an intent to modify the relationship between the surface and the

mineral estates depends on the terms of the lease.  *Id*.  Entek points to nothing in its

leases or patents that expressly creates a unilateral right in the mineral lessee to bind

the surface estate to a unitization agreement.  In fact, Mr. Smith, Entek's land manager,

testified that he did not notice such a reservation of rights in Entek's leases or patents.

After reviewing the FRU agreement, the Court does not find anything in the FRU

that expressly "expands the burden on the [Stull's] surface estate because [Entek's]

mineral estates are included within a unit or FRU."  *Three Forks Ranch*, 2004 WL

5615898, at *12.  Although Entek cites to § 18 of the FRU as modifying the lease terms,

the Court notes that this modification applies only to leases that are included in the

FRU.  Pl. Ex. 10 at 2.  As noted above, Stull does not participate in the FRU and

therefore its lease is not subject to the modifying terms of § 18.  As the *Three Forks*

*Ranch* court observed, nothing in the FRU requires or mandates that the owners of

surface estates participate in the FRU.  2004 WL 5615898, at 14.  Additionally, it is

clear from the FRU agreement that it pertains only to the mineral leases and regulates

19

the relationship among mineral holders and mineral estates within the FRU.  *See* Pl. Ex. 10 at 2 ("the parties hereto are owners of working, royalty, or other oil and gas interests in the unit area subject to this agreement").[5]  The language of the FRU makes it clear that the agreement is voluntary and is not a compulsory regulation.  *See id.*  ("in consideration of the premises and the promises herein contained, the parties hereto commit to this agreement their respective interests in the below-defined unit area and agree severally among themselves as follows").  Furthermore, unlike the Keys lease in *Kysar*, there is no indication that the federal mineral leases retained a unilateral right to bind the surface estate to a pooling or unitization agreement.  Accordingly, the Court finds that Entek is unlikely to succeed on its FRU unitization theory.

The Court also finds that the MLA does not expressly burden surface estates that are not included within a unit agreement.  *See* 30 U.S.C. § 226(m).  Section 226(m) relates only to the owners of mineral estates and not to surface estates.  *See, e.g.,* 30 U.S.C. § 226(m) ("The Secretary may provide that oil and gas leases hereafter issued under this chapter shall contain a provision requiring the lessee to operate under such a reasonable cooperative or unit plan . . . The Secretary of the Interior is hereby authorized, on such conditions as he may prescribe, to approve operating, drilling, or development contracts made by one or more lessees of oil or gas leases . . . ).  In fact, § 226(m) shows that the creation of a federal unit is permissive and requires the cooperation and agreement of the members in the unit.  *See id.* ("For the purpose of more properly conserving the natural resources of any oil or gas pool . . . lessees

---

[5]Additionally, the FRU has explicit provisions for parties who refuse to join the FRU.  *See* Pl. Ex. 10 at 12, § 28.

thereof and their representatives *may* unite with each other, or jointly or separately with others, in collectively adopting and operating under a cooperative or unit plan") (emphasis added). All of this evidence shows that the MLA does not expressly or impliedly compel non-participating members of the FRU to subject their surface estates to a higher burden than is required under law. *Cf. Coquina Oil Corp. v. Harry Kourlis Ranch*, 643 P.2d 519, 523 (Colo. 1982) (finding that a federal and gas lessee could not assert a constitutional right to condemn private property because leases from the federal government do not guarantee access to the leasehold).

Stull has not voluntarily abrogated its rights as the owner of the surface estate. And Entek has provided no evidence in support of a unilateral right to bind Stull to the terms of the FRU. Therefore, the Court finds that Entek has not shown a likelihood of success on the merits of this argument.

### 4. Unity Rule

To obviate the need to secure bonds for its leases, Entek relies on *Mountain Fuel's* unity rule. The unity rule states that, if different surface tracts are under common ownership, they should be treated as one tract for purposes of considering the allowed use of the surface by a mineral lessee. 471 F.3d at 597. Entek argues that, because it is drilling directionally, it will develop minerals subjacent Stull's estate and therefore can utilize the unity rule because it owns Patents 1010281 and 985094. *See* Def. Ex. J. Therefore, Entek argues that it is entitled to access the entire surface owned by Stull to operate for and develop minerals anywhere under Stull surface. Docket No. 126 at 11.

Given that the 3-1 well is not located on Stull's property, Entek's reliance on the unity rule is misplaced.  In *Mountain Fuel*, the Tenth Circuit made it clear that, in unitized fields, the location of the well was the most important factor.  471 F.2d at 597 ("plaintiffs could not use defendants' surface for the development *on* the lands of others or to haul over such surface the *production from the land of others*") (emphasis added); *see Three Forks* Ranch, 2004 WL 5615898, at *15 ("the plaintiffs may not cross the surface estate of the defendant to access the plaintiffs' mineral estate in another tract whose surface is not owned by the defendant"); *Kysar*, 93 P.3d at 1284 (finding that, although plaintiff's land was held in common, defendant could not utilize non-communitized land to reach a well on the communitized lands).  Thus, because the 3-1 well is located on BLM property, the two surface owners rule restricts Entek's ability to cross Stull's surface estate to reach the 3-1 well.  Entek therefore fails to establish a likelihood of success on the merits of this argument.

In sum, because Entek has provided no evidence to establish that its federal leases, federal unitization, or the unity rule give it a legal right to cross Stull's surface, the Court finds that Entek has not met its heightened burden of showing that it has a likelihood of success on the merits.  *Kikumura*, 242 F.3d at 955.[6]

### B.  Irreparable Harm

Entek claims that, if it is not granted access to the 3-1 well before October 2012, the delay in production could cost $1.2 to $1.8 million annually in lost revenue.  Entek admits that this estimate assumes that the 3-1 well will produce up to 200 barrels of oil

---

[6]Even without a heightened burden, Entek has not shown a likelihood of success on the merits.

per day, but states that this assumption is reasonable given the similar, known characteristics of the 12-1 well.  In addition, Entek asserts that delay is harmful because Entek will lose the intangible benefit of acquiring knowledge of the geological structure of the FRU.

To satisfy the irreparable harm requirement, a plaintiff must demonstrate "a significant risk that he or she will experience harm that cannot be compensated after the fact." *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003). The party seeking injunctive relief must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief. *Schrier*, 427 F.3d at 1267.  As a general rule, economic loss "usually does not, in and of itself, constitute irreparable harm [because] such losses are compensable by monetary damages." *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003). The Supreme Court has noted that the "temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury." *Sampson v. Murray*, 415 U.S. 61, 90 (1974).

Some courts have found that a plaintiff may be subject to irreparable harm if the economic damages lead its business towards bankruptcy or threaten the viability of its survival. *Doran v. Salem Inn, Inc.*, 422 U.S. 922 (1975) (threat of bankruptcy constitutes irreparable harm); *Tri-State Generation v. Shoshone River Power, Inc.*, 805 F.2d 351, 356 (10th Cir. 1986) (threat to trade or business viability is irreparable harm). Entek does not argue that its failure to reach the 3-1 well threatens the viability of its business enterprise.  Nor has Entek provided any information as to what effect, if any,

the delay in the realization of $1.2 to $1.8 million per year will have on its business ventures or how much of its total revenues this constitutes.  *See TD Int'l, LLC v. Fleischmann*, 639 F. Supp. 2d 46, 48-49 n.3 (holding that plaintiff failed to establish irreparable harm because, even assuming plaintiff's alleged economic loss of over one million dollars, this alleged loss was "never placed in the context of the financial condition of [plaintiff's] business.").  Accordingly, because Entek's harm is purely economic, it does not qualify as irreparable harm.  *See Virginia Carolina Tools, Inc. v. Int'l Tool Supply, Inc.*, 984 F.2d 113, 120 (4th Cir. 1993) (finding that loss of profits, loss of volume discount, and loss of sales were not irreparable because they were economic and highly speculative losses).

Moreover, Entek is currently working with the BLM to develop another road to access the 3-1 well.  Although Mr. Hopkins testified that the BLM has been reluctant to date to approve such a road over its surface,[7] the possibility still exists.

Consequently, Entek has not shown that, in the absence of a preliminary injunction during the time it will take to litigate this case, it would be impossible to resume drilling activity or that the delay in drilling activities will cause irreparable harm. Accordingly, plaintiff has provided no reason for this Court to depart from the established rule that economic harm does not constitute irreparable injury.  *See, e.g., Tri-State*, 805 F.2d at  356 (threat to trade or business viability is irreparable harm); *see also Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1172 (7th Cir. 1997) ("a plaintiff

_____

[7]As Stull noted at the hearing, there is an irony when both the surface on which the 3-1 well is located and the minerals subjacent to it are owned by the same entity (the BLM), which could provide access to its lessee (Entek) over its surface, but which has not done so.

who cannot show any irreparable harm at all from the withholding of a preliminary injunction is not entitled to the injunction however strong his case on the merits, for he has no need for preliminary relief in such a case, no need therefore to short circuit the ordinary processes of the law.").

### C.   Balance of the Equities and Public Interest

The balance of the equities and public interest also both lie in Stull's favor. Granting the preliminary injunction would upset expectations regarding property rights between mineral owners and surface area owners based upon the principles recognized in *Mountain Fuel*.  The public interest is best served when established contract and property rights are enforced.  *See Leo Sheep Co. v. U.S.*, 440 U.S. 668, 687-88 (1979) (noting that courts should not interfere with the certainty and predictability of land titles conferred by the federal government).

To the extent Entek asserts that it is in the public interest to protect the rights of owners of mineral estates, the Court notes that nothing in this Court's ruling limits Entek's ability to remove minerals subjacent to Stull's surface.  Entek is only required to do so from a well located on Stull's surface.

## III.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Entek GRB LLC's Motion for Preliminary Injunction on 3-1 Well and Brief in Support [Docket No. 126] is **DENIED**.

DATED August 7, 2012.

BY THE COURT:


  s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge